No. 25-2050

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

ARKANSAS CRYPTOMINING ASSOCIATION,
Plaintiff-Appellee,

v.

ALAN YORK, et al.,
Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Arkansas
No. 4:25-cv-234 (Hon. Kristine G. Baker)

## Defendants-Appellants' Reply Brief

TIM GRIFFIN
  Arkansas Attorney General

AUTUMN HAMIT PATTERSON
  Solicitor General

NOAH P. WATSON
  Deputy Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
101 West Capitol Avenue
Little Rock, Arkansas 72201
(501) 682-1019
noah.watson@arkansasag.gov

# Table of Contents

Table of Contents ................................................................i

Table of Authorities ................................................ iiii

Argument................................................................ 1

  I.  Act 174 and Rule K are not Conflict Preempted. ...........................2

    A.  State laws are not preempted by federal laws due to mere differences .....................................................2

      i.  It is possible to comply with federal law and Act 174 and Rule K.....................................................7

      ii.  Act 174 and Rule K pose no obstacle to federal law ................................................................9

      iii.  CFIUS and ITAR were not designed to preempt laws like Act 174 and Rule K............................ 11

    B.  The Association's misunderstanding of the statutes and incorrect assertions of forfeiture provide no basis for affirmance ............................................ 14

  II.  Act 174 and Rule K are not Field Preempted............................... 18

    A.  The Association's arguments misunderstand and misapply Supreme Court precedent ............................... 19

    B.  The Association's field-preemption argument fails even if this Court adopts the Ninth Circuit's test ........................................................... 21

  III.  The Preliminary Injunction is Overbroad ................................... 25

i

Appellate Case: 25-2050    Page: 2    Date Filed: 02/18/2026 Entry ID: 5609133

IV.  The Alternative Grounds for Affirmance
Are Unavailing ................................................................ 30

Conclusion ................................................................................ 33

Certificate of Compliance ........................................................ 34

Certificate of Service ............................................................... 35

ii

Appellate Case: 25-2050     Page: 3     Date Filed: 02/18/2026 Entry ID: 5609133

# Table of Authorities

**Cases**                                          **Page(s)**

*Am. Ins. Ass'n v. Garamendi,*
539 U.S. 396 (2003) .................... 9-10, 14-15, 19, 21-22

*Applegate v. Lum Jung Luke,*
291 S.W. 978 (Ark. 1927) ................................ 24

*Bio Gen LLC v. Sanders,*
142 F.4th 591 (8th Cir. 2025) ...................... 5, 8, 12

*Blythe v. Hinckley,*
180 U.S. 333 (1901) ................................... 1, 24

*Chamber of Com. of U.S. v. Whiting,*
563 U.S. 582 (2011) ...................................... 6, 9

*Clark v. Allen,*
331 U.S. 503 (1947) ...................... 7, 18-20, 22-23

*Compt'r of Treas. Md. v. Wynne,*
575 U.S. 542 (2015) ........................................ 21

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000) ...................... 7, 9-11, 14-15

*Droste v. Julien,*
477 F.3d 1030 (8th Cir. 2007) ...................... 29, 30

*Exxon Corp. v. Gov. of Md.,*
437 U.S. 117 (1978) ...................................... 32

*Frye v. Kan. City Mo. Police Dep't,*
375 F.3d 785 (8th Cir. 2004) .............................. 1

*Hicks v. Miranda,*
422 U.S. 332 (1975) ...................................... 21

*Miller v. California,*
418 U.S. 915 (1974) ...................................... 21

Appellate Case: 25-2050     Page: 4     Date Filed: 02/18/2026 Entry ID: 5609133

*Movsesian v. Victoria Versicherung AG*,
670 F.3d 1067 (9th Cir. 2012) (en banc) ......................................22, 23

*Murphy v. NCAA*,
584 U.S. 453 (2018)..............................................................7, 11

*Oneok, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015)....................................................................5

*Pharm. Rsrch. & Mfrs. of Am. v. McClain*,
95 F.4th 1136 (8th Cir. 2024) ......................................................6

*PLIVA, Inc. v. Mensing*,
564 U.S. 604 (2011)....................................................................6

*Porterfield v. Webb*,
263 U.S. 225 (1923).................................................................31

*Pruitt v. Smith*,
610 S.W.3d 660 (Ark. 2020) .....................................................16

*Reinard v. Crown Equip. Corp.*,
983 F.3d 1064 (8th Cir. 2020).....................................................17

*Shames v. Nebraska*,
323 F. Supp. 1321 (D. Neb. 1971)............................................ 19, 20

*Shames v. Nebraska*,
408 U.S. 901 (1972)............................................................ 19, 20

*Shen v. Comm'r, Fla. Dep't of Ag. & Consumer Servs.*,
158 F.4th 1227 (11th Cir. 2025) .................................................11

*Sisney v. Kaemingk*,
15 F.4th 1181 (8th Cir. 2021) ....................................................27

*Styczinski v. Arnold*,
141 F.4th 950 (8th Cir. 2025) ....................................................29

*Terrace v. Thompson*,
263 U.S. 197 (1923).................................................................31

iv

Appellate Case: 25-2050     Page: 5     Date Filed: 02/18/2026 Entry ID: 5609133

*TikTok, Inc. v. Garland,*
  122 F.4th 930 (D.C. Cir. 2024)............................................................ 32

*Tovar v. Essentia Health,*
  857 F.3d 771 (8th Cir. 2017)........................................................ 4, 30

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025)............................................................ 25, 28-29

*United States v. Darusmont,*
  449 U.S. 292 (1981)................................................................... 31

*United States v. Moua,*
  145 F.4th 929 (8th Cir. 2025) ......................................................... 32

*United States v. Myrick,*
  107 F.4th 873 (8th Cir. 2024) .......................................................... 4

*United States v. Rodgers,*
  461 U.S. 677 (1983)................................................................... 32

*United States v. Veasley,*
  98 F.4th 906 (8th Cir. 2024) ........................................................... 8

*Williamson v. Mazda Motors of Am., Inc.,*
  562 U.S. 323 (2011)................................................................. 6, 8

*WinRed, Inc. v. Ellison,*
  59 F.4th 934 (8th Cir. 2023) ........................................................... 1

*Wivell v. Wells Fargo Bank, N.A.,*
  773 F.3d 887 (8th Cir. 2014)......................................................... 30

*Wyeth v. Levine,*
  555 U.S. 555 (2000).................................................................. 13

*Zschernig v. Miller,*
  389 U.S. 429 (1968).............................................................. 18-22

**Rules & Statutes**

48 U.S.C. § 1501 ...................................................................... 13

v

50 U.S.C. § 2170 .................................................................. 16

50 U.S.C. § 4565 ......................................................... 8, 10, 15

Ark. Code Ann. § 1-2-117 ................................................... 25

Ark. Code Ann. § 1-2-205 ................................................... 25

Ark. Code Ann. § 14-1-603 ............................................ 15, 17

Ark. Code Ann. § 23-119-101 .................................................. 4

Fed. R. App. P. 10 ......................................................... 28, 29

**Other Authorities**

Pub. L. 115-232, § 1702 ............................................... 4, 10, 13

Appellate Case: 25-2050    Page: 7    Date Filed: 02/18/2026 Entry ID: 5609133

**Argument**

States have regulated ownership of real and personal property—including foreign ownership—since the Founding. *E.g.*, *Blythe v. Hinckley*, 180 U.S. 333, 341 (1901). That's just what the challenged portions of Act 174 and Rule K do. And the unchallenged portions create a permitting scheme for an emerging industry to protect against the industry's massive consumption of power and water and shield local property owners from excessive noise. Those types of regulations undoubtedly fall within the States' traditional regulatory power. *E.g.*, *Frye v. Kan. City Mo. Police Dep't*, 375 F.3d 785, 791 (8th Cir. 2004) ("health and safety" regulations are "a traditional exercise of the State's police powers" (citation modified)). And when States regulate in their traditional spheres, the presumption against preemption applies. *WinRed, Inc. v. Ellison*, 59 F.4th 934, 942 (8th Cir. 2023).[1]

---

[1] Even in *Iowa Migrant Movement for Justice v. Bird*, where Iowa's law was "not a traditional subject of state regulation," the Court only held that "the *greatest* presumption against preemption" likely did not apply; it did not hold that *no* presumption applied. 157 F.4th 904, 920 (8th Cir. 2025) (emphasis added). *But see* Appellee Br. 39 (asserting *Iowa Migrant Movement* "reject[ed] any 'presumption against preemption'").

Appellate Case: 25-2050     Page: 8     Date Filed: 02/18/2026 Entry ID: 5609133

The Association seeks the opposite presumption, however, based on mere differences between federal and state laws that address different subjects. That's not how preemption works. The Court should reverse or vacate the district court's order granting a preliminary injunction.

## I.   ACT 174 AND RULE K ARE NOT CONFLICT PREEMPTED.

### A. State laws are not preempted by federal laws due to mere differences.

As Defendants explained, state laws are foreign-affairs conflict preempted only if (1) they address "the same foreign-policy question" as the federal law, Appellants' Br. 22, 30; (2) they "directly interfere with the operation of the federal" law, *id.* at 26 (citation modified); and (3) Congress intended no other regulations to touch on that question, *id.* at 34–35.[2] The Association, however, prefers an analysis that would eviscerate our federal system: if a state law is different than federal law in any way,

---

[2] The Association accuses Defendants of advancing a contradictory conflict-preemption test from the defendants in *Jones Eagle v. Ward*, No. 25-1047. Although the defendants in that appeal use different wording, the tests are the same. *See* Appellants' Br. 31–32, *Jones Eagle v. Ward*, No. 25-1047 (8th Cir. May 15, 2025) (formulating the test as requiring (1) the state law to "regulate[] the [same] 'basic subject'" as the federal law; (2) the state law to be "at odds with … the federal" law; and (3) Congress's intent to box out States from "the zone of non-regulation" (third alternation in original) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000)).

2

it is preempted. The Association points to the following differences between federal and state law, each of which it claims amounts to a preemptive conflict:

- FIRRMA provides for discretionary national-security review of certain transactions involving foreign interests, while Act 174 and Rule K require permitting for all digital asset mining businesses to protect against excessive noise emissions, power consumption, and water usage and prohibit certain foreign parties from owning an interest in those businesses. *See* Appellee Br. 19.

- Act 174 and Rule K apply to "prohibited foreign parties," but differently defined sets of foreign parties are utilized for FIRMMA (all foreign entities) and ITAR (entities from designated foreign counties). *Id.* at 19–20, 23–24

- CFIUS and the President theoretically may not prohibit or suspend a transaction in which a prohibited foreign party obtains an interest in a digital asset mining business in Arkansas, though Act 174 and Rule K prohibit the prohibited foreign party from obtaining any interest. *Id.* at 20.

3

Appellate Case: 25-2050    Page: 10    Date Filed: 02/18/2026 Entry ID: 5609133

- ITAR "solely ... restrict[s] arms sales" to countries like China, Iran, and North Korea, but Act 174 and Rule K prohibit nationals of those countries from owning an interest in digital asset mining businesses in Arkansas. *Id.* at 22.[3]

These are certainly differences between Arkansas's laws and federal law. That's not surprising. Federal law does not purport to address local concerns—like foreign ownership of Arkansas digital asset mining businesses or the "significant noise emissions," "massive" power consumption, substantial water usage, and local cybersecurity issues. Ark. Code Ann. § 23-119-101(b)(1). As the Association admits, CFIUS's review is focused only on national "security concerns." Appellee Br. 19; *see* Pub. L. 115-232, § 1702(b)(9) (CFIUS "should not consider issues of national interest absent a national security nexus."). But mere differences

---

[3] In three sentences, the Association also says Act 174 and Rule K conflict with OFAC. *See* Appellee's Br. 24. As below, the Association merely "mention[s]" OFAC and fails to "discuss[]" the "substance of OFAC's regulations." Add. 40; App. 200; R. Doc. 32, at 40. Thus, the district court didn't analyze OFAC, and this Court shouldn't either. *See Tovar v. Essentia Health*, 857 F.3d 771, 779 (8th Cir. 2017) (remanding "for the district court to consider an alternative argument in the first instance"); *United States v. Myrick*, 107 F.4th 873, 876 n.4 (8th Cir. 2024) (noting the Court "will not address" arguments a party "fails to develop").

Appellate Case: 25-2050   Page: 11   Date Filed: 02/18/2026 Entry ID: 5609133

between federal and state law—even regulations that may sometimes touch on the same subject—are not preemptive conflicts. *See Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 386–87 (2015) ("[N]o one could claim that [federal] regulation of [a] physical activity for [one purpose] forecloses every other form of state regulation that affects" that activity.). Indeed, if things were otherwise, state law would have to begin and end in the exact place as federal law. So much for our federalist system.

Consider non-preemption examples, drawn from this Court and the Supreme Court's decisions:

- Congress's legalization of hemp did "not mean [States] must" legalize it or, if they did legalize it, "that the states must use the federal definition of hemp" instead of a narrower one. *Bio Gen LLC v. Sanders*, 142 F.4th 591, 603 (8th Cir. 2025).

- "Congress's decision not to legislate the issue of pharmacy distribution" in a federal program where drug manufacturers were required to sell discounted drugs to certain hospitals, but not to those hospitals' contracted pharmacies, didn't mean States were barred from regulating that question, but rather "indicate[d] that Congress did not intend to preempt" state regulation of it.

5

Appellate Case: 25-2050     Page: 12     Date Filed: 02/18/2026 Entry ID: 5609133

*Pharm. Rsrch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1143–44 (8th Cir. 2024).

- A regulation that "le[ft] manufacturers with a choice" between two types of seat belts because the agency thought requiring the safer belt would not be cost-effective did not preempt state law that would mandate using the safer belt based on "a different conclusion" about cost effectiveness. *Williamson v. Mazda Motors of Am., Inc.*, 562 U.S. 323, 332, 335 (2011).

- A statute that forbade the Secretary of Homeland Security from mandating participation in a federal program did not preempt States from mandating participation in that program "because the State of Arizona is not the Secretary." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 608 (2011).

If those profound differences between federal and state law do not suffice for conflict preemption, what does? Conflict. State laws are preempted when it is impossible to comply with both federal and state law, *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011); when the state law "directly interfere[s] with the operation of [a] federal program," *Whiting*, 563 U.S. at 604; or when federal law "confers on private entities … a

6

federal right to engage in certain conduct" that state law abridges, *Murphy v. NCAA*, 584 U.S. 453, 478–79 (2018).  For example, in the foreign-policy context, the Supreme Court held that a statute providing some sanctions on Burma but prohibiting the President from imposing others implicitly preempted state sanctions of the same kind.  *See Crosby*, 530 U.S. at 377–80.  This reading was warranted because Congress provided a "carefully defined" set of exemptions that reflected  "a deliberate effort 'to steer a middle path'" toward encouraging Burma to democratize and that "inconsisten[t]" state sanctions would "undermine[]." *Id.* at 377, 378, 380 (citation omitted).  But laws that merely "have some incidental or indirect effect in foreign countries" without "conflict[ing] with the national policy" are not preempted.  *Clark v. Allen*, 331 U.S. 503, 509, 517 (1947).

### i.  *It is possible to comply with federal law and Act 174 and Rule K.*

The differences between federal law and Act 174 and Rule K are mere differences, not preemptive conflicts.  Starting first with impossibility, the Association does not assert that it is impossible to comply with federal and state law.  At most, it claims a transaction that "clears" CFIUS review may be prohibited by Act 174 and Rule K, not that federal

7

Appellate Case: 25-2050     Page: 14     Date Filed: 02/18/2026 Entry ID: 5609133

law requires the Association to engage in transactions that would end in state-law prohibited ownership interest. Appellee Br. 20. The Association describes that hypothetical scenario as "inevitabl[e] conflict," *id.*, but that's wrong for two reasons.

First, as this Court's decisions in *Bio Gen* and the Supreme Court's decision in *Williamson* illustrate, it is commonplace for state laws to prohibit conduct that federal law permits or even specifically authorizes. That's particularly true of CFIUS review, under which the Executive Branch only "suspend[s] or prohibit[s]" covered transactions, not affirmatively approves them. 50 U.S.C. § 4565(d)(1); *see* Appellant's Br. 27 (without national-security concerns, CFIUS "must close its review and loses jurisdiction").

Second, because the Association brought a facial challenge, App. 8; R. Doc. 1, at 2, it must show that under every "set of circumstances" Act 174 and Rule K would be preempted by CFIUS, *United States v. Veasley*, 98 F.4th 906, 909 (8th Cir. 2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). If you take the opposite hypothetical of the one proposed by the Association—a covered transaction that's prohibited by CFIUS review—then, even under the Association's preemption theory,

Appellate Case: 25-2050    Page: 15    Date Filed: 02/18/2026 Entry ID: 5609133

there would be no conflict between federal and state law because neither would allow the prohibited foreign party to obtain an interest in an Arkansas digital asset mining business. Since there are at least some circumstances where a CFIUS-reviewed transaction would not preempt Act 174 and Rule K, the Association's facial claim fails in its entirety.

### ii. Act 174 and Rule K pose no obstacle to federal law.

Next, the Association invokes obstacle preemption, Appellee Br. 24–27, where preemption occurs if state laws "directly interfere[s] with the operation" of federal law, *Whiting*, 563 U.S. at 604 (describing the cases in the Association's brief as addressing laws with that effect). The Association likens this case to *Crosby* and *Garamendi*. In both cases, the federal statutes created considerable bargaining power to extract desired actions from foreign actors: the Burma statute gave the President the power to lift sanctions on Burma to induce democratization, *see Crosby*, 530 U.S. at 377, while the executive agreements in *Garamendi* sought to leverage repose from suit in exchange for voluntary settlement of Nazi-era insurance claims, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 424 (2003). By subjecting Burma to state sanctions and subjecting foreign insurance companies to disclosure mandates and state tort suits, the

9

Appellate Case: 25-2050     Page: 16     Date Filed: 02/18/2026 Entry ID: 5609133

state laws held preempted in *Crosby* and *Garamendi* gave "the President … less to offer and less economic diplomatic leverage as a consequence." *Id.* at 424 (quoting *Crosby*, 530 U.S. at 377).

The Association generically asserts something of the sort is happening here, claiming that Act 174 and Rule K "disrupt the federal government's … carefully-crafted balance between encouraging foreign investment and mitigating risks to national security."  Appellee Br. 26.  But there is no comparable "bargaining chip" FIRRMA or ITAR confers on the President that Arkansas's laws "reduce[] the value of."  *Crosby*, 530 U.S. at 377.  FIRRMA imposes mandates on the Executive Branch to "take any necessary actions … to protect the national security of the United States" if a "transaction threatens to impair the national security of the United States."  50 U.S.C. § 4565(b)(2)(A), (b)(2)(B)(i)(I).  Because CFIUS does not consider covered transactions "absent a national security nexus," Pub. L. 115-232, § 1702(b)(9), States are certainly free to regulate business-entity ownership for other reasons.  And the ITAR analysis is even more inapposite because its only purpose is to prevent arms exports to countries to which those exports would be especially dangerous; Act 174 and Rule K do not touch, much less conflict with, that purpose.  *See*

10

Appellate Case: 25-2050     Page: 17     Date Filed: 02/18/2026 Entry ID: 5609133

Appellants' Br. 29–30.  Indeed, the Eleventh Circuit recently upheld Florida's registration and affidavit requirements related to Chinese-domiciliary-owned land over alleged FIRRMA preemption.  *Shen v. Comm'r, Fla. Dep't of Ag. & Consumer Servs.*, 158 F.4th 1227, 1263–66 (11th Cir. 2025).  While those requirements did not preemptively "prohibit or otherwise restrict" transactions that CFIUS might review, *id.* at 1265, nevertheless, "it [was] a crime to violate" the registration or affidavit requirements, *id.* at 1239, and that would be true whether a transaction cleared CFIUS review or not.

### iii. CFIUS and ITAR were not designed to preempt laws like Act 174 and Rule K.

Finally, CFIUS review and ITAR export controls do not "confer[] rights on private actors" to engage in the sorts of transactions that CFIUS permits or to engage in transactions that neither statute regulates at all—such as obtaining an interest in an Arkansas digital asset mining business.  *NCAA*, 584 U.S. at 477.  The Association does not claim that CFIUS or ITAR confer rights on private actors.  But determining whether federal law is intentionally "drawn … to allow what [it] permit[s]" is fundamental to determining whether Congress's nonregulation is preemptive.  *Crosby*, 530 U.S. at 380; *see NCAA*, 584 U.S. at 477

11

(explaining that all laws that preempt state law either "impose[] restrictions" countermanded by federal law or "confer[] rights on private actors" that state law abridges); *Bio Gen*, 142 F.4th at 603 (asking whether Congress sought to legalize hemp federally or "coercively mandate nationwide legality"); *see supra* n.2.  Absent that limit, States could never regulate what the federal government does not; the boundary of federal regulation would mark the boundary of state regulation.  That makes no sense.  For state regulation to conflict with federal nonregulation, courts must find a federal right, not just a regulatory void.

Applying that logic to CFIUS and ITAR, this Court must decide whether CFIUS was drawn to confer a right on foreigners to acquire interests in American digital asset mining businesses absent a national-security concern or whether ITAR was drawn to confer rights on nationals of countries like China and North Korea to engage in unfettered trade (by for example obtaining interest in digital asset mining businesses) with America so long as it does not involve arms exports.

Those questions all but answer themselves.  CFIUS's jurisdiction ends at national security because that was all Congress deemed a proper subject for it.  We know this, not just from Congress's expressed intent,

12

Pub. L. 115-232, § 1702(b)(9), but also because States have regulated alien property ownership since the Founding, *see* Appellants' Br. 35, and Congress did nothing to preempt that traditional regulation, *Wyeth v. Levine*, 555 U.S. 555, 575 (2000) (explaining that congressional "silence" plus "awareness of the prevalence of state" regulation "is powerful evidence" that preemption was not intended). Indeed, Congress left standing its own century-old ban on alien land ownership on federal territories and enclaves, *see* 48 U.S.C. § 1501, which is inconsistent with the notion that Congress intended to broadly permit foreign land ownership absent national-security concerns, and (given its limitation to *federal* territory) implies that Congress left foreign property ownership to the States.

*   *   *

Left with neither interference with CFIUS's nor ITAR's objectives, nor a federal right to engage in free trade that Act 174 or Rule K restricts, the Association points to mere regulatory differences, observing that in foreign-policy preemption cases, the Supreme Court has said that a "[c]onflict in [regulatory] technique" can lead to preemption, Appellee Br. 19 (quoting *Arizona v. United States*, 567 U.S. 387, 406 (2012)), "[e]ven where" state and federal law pursue "common policy goals," *id.* at 29 (citing *Crosby*, 530 U.S. at 381).

13

Appellate Case: 25-2050    Page: 20    Date Filed: 02/18/2026 Entry ID: 5609133

But that "even where" should be an "only where." Though the Association insists otherwise, *see id.* at 27–28 (denying that state and federal law need even concern the "same foreign-policy question" before preemption applies), one can only sensibly talk of a conflict in technique or "conflicting means" if state and federal law share a "common end," *Crosby*, 530 U.S. at 379. The state laws in *Crosby* and *Garamendi* sought to achieve "the same goals" and "same objective" as federal law, *id.* at 379; *Garamendi*, 539 U.S. at 426, but differed from, and undermined, federal judgments about how best to achieve those aims. Arkansas's laws, by contrast, are not about national security and arms exports, so they cannot depart from Congress's judgments in FIRRMA and ITAR. Instead, they address local concerns about excessive utility usage, noise emissions, and cybersecurity threats by digital asset mining businesses— issues about which Congress has remained silent.

### B. The Association's misunderstanding of the statutes and incorrect assertions of forfeiture provide no basis for affirmance.

The Association advances four additional assertions to support its conflict-preemption argument, but none move the ball.

14

Appellate Case: 25-2050     Page: 21     Date Filed: 02/18/2026 Entry ID: 5609133

First, it asserts CFIUS review creates a bargaining chip for the President by allowing CFIUS to make "agreement[s] or condition[s] with any party to the covered transition in order to mitigate any risk to the national security" under 50 U.S.C. § 4565(l)(3)(A)(i). *See* Appellee Br. 30 n.12. But even if transaction-by-transaction inquiry could be considered a bargaining chip like those in *Crosby* and *Garamendi* that applied uniformly, CFIUS's bargaining chip would relate only to "national security." 50 U.S.C. § 4565(l)(3)(A)(i). It is not, as the Association implies, a bargaining chip that allows the Executive Branch to bestow a get-out-of-local-regulations-free card. Otherwise, CFIUS review would preempt every municipal zoning law, county land-use regulation, and—like the bulk of Act 174—state permitting of industries that pose unique difficulties for the State's citizens. *See* Appellants' Br. 22.

Second, as Defendants explained, prohibited foreign parties may under Arkansas Code § 14-1-603(5) obtain an interest in digital asset mining businesses if the total output is less than one megawatt, so they will still be able to operate in Arkansas if their transaction survives CFIUS review and therefore will not devalue the executive's bargaining chip. *See* Appellants' Br. 28–29. The Association says little in response

15

except to twice derogatorily call that argument a "literal[] construction" of the Arkansas Code. Appellee Br. 33. But that's how it's supposed to be interpreted. *See Pruitt v. Smith*, 610 S.W.3d 660, 662 (Ark. 2020) (explaining that statutes should be "given [their] plain meaning" (citation omitted)).

Third, the Association accuses Defendants of "fail[ing] to address the Exon-Florio Amendment" that allows CFIUS to review mergers, acquisitions, and takeovers. Appellee Br. 31. But Defendants repeatedly discuss CFIUS's authority to review these types of transactions. *E.g.*, Appellants' Br. 19, 26, 27, 32, 33, 36 (mentioning CFIUS reviews foreign acquisitions). And it's no wonder Defendants did not use the words "Exon-Florio Amendment" or cite the specific statutory section (50 U.S.C. § 2170) that the Association does; the district court did not base its analysis on that amendment—or even cite it. In fact, it's unclear if the Association relied on it before its appellate brief. *See* R. Docs. 6, 15 (Association's preliminary-injunction briefing).

Appellate Case: 25-2050    Page: 23    Date Filed: 02/18/2026 Entry ID: 5609133

Finally, the Association repeatedly argues forfeiture.[4]  For one, it argues Defendants forfeited the argument that CFIUS and ITAR are not discretionary bargaining schemes.  Appellee Br. 29–30, 32.  But the district court specifically ruled on that argument.  *See* Add. 48–49; App. 208–09; R. Doc. 32, at 48–49 (holding that Arkansas's laws "impermissibly hamstring" federal officials' "discretion" over "foreign affairs").  And Defendants argued below that Act 174 and Rule K did not "frustrate[] or impact[]" the Executive Branch's ability to exercise its CFIUS and ITAR authority.  R. Doc. 12, at 20.  For another, the Association argues that Defendants forfeited the statutory definition of "digital asset mining business" in Arkansas Code § 14-1-603(5), seemingly because they used the term below without specifically pointing to the statutory definition. *See* Appellee Br. 32.  But the Association identifies no precedent holding that a party forfeits a statutory definition by using a statutory term

---

[4] The Association uses the term "waiver" or "waived." *E.g.*, Appellee Br. 30. But waiver requires an "intentional relinquishment." *Reinard v. Crown Equip. Corp.*, 983 F.3d 1064, 1066 (8th Cir. 2020) (citation omitted).  The Association does not argue Defendants intentionally relinquished any argument.  Thus, its analysis sounds in forfeiture, which is a failure to "timely assert[]" the argument and is still "review[ed] … for plain error." *Id.*

17

without repeating the statutory definition.  And that's no surprise.  When parties uses a statutory term, it only makes sense that they are using the statutory definition.

## II.   ACT 174 AND RULE K ARE NOT FIELD PREEMPTED.

Act 174 and Rule K are not field preempted either.  The Association's field-preemption case-in-chief, *Zschernig v. Miller*, 389 U.S. 429 (1968), held invalid as-applied an alien-inheritance law because the state courts were conducting "minute inquiries … into the credibility of foreign diplomatic statement," "the type of governments that obtain in particular foreign nations," and "the 'democracy quotient' of a foreign regime opposed to the Marxist theory."  *Id.* at 434–35.  It also reaffirmed its prior holding that States' alien-inheritance restrictions were not facially preempted.  *Id.* at 433 (citing *Clark*, 331 U.S. 503).  Indeed, the *Clark* Court said it was "extraordinary" and "far fetched"—"in [the] absence of a treaty"—to argue that States could not "ent[er] into foreign affairs." 331 U.S. at 517.  The Association's far-fetched arguments that Act 174 and Rule K are field preempted are unpersuasive.

18

Appellate Case: 25-2050     Page: 25     Date Filed: 02/18/2026 Entry ID: 5609133

### A. The Association's arguments misunderstand and misapply Supreme Court precedent.

The Association agrees that "*Zschernig* is good law," Appellee Br. 35 (emphasis omitted), but they dispute how *Zschernig* applies. Defendants' interpretation of *Zschernig* and *Clark* gives the Court's holdings full meaning: state laws regulating foreign affairs are field preempted by the foreign-affairs power only if in application they invite judicial criticism of foreign governments. *See* Appellants' Br. 44–46; *Shames v. Nebraska*, 323 F. Supp. 1321, 1332 (D. Neb. 1971) ("[E]very court which as considered *Zschernig*, has interpreted it to mean that judicial criticism of foreign governments is constitutionally impermissible, and the decision extends no further than that."), *aff'd*, 408 U.S. 901 (1972); *Garamendi*, 539 U.S. at 439 (Ginsburg, J., dissenting, joined by Stevens, Scalia, and Thomas, JJ.) ("*Zschernig* … resonates most audibly when a state action reflects a state policy critical of foreign governments and involves sitting in judgment on them." (citation modified)). To this straightforward analysis, the Association offers no alternative to harmonize *Clark* and *Zschernig*. It only notes that "*Zschernig* itself distinguished *Clark*." Appellee Br. 43. But spotting a distinction between cases is only the beginning of the analysis, not the end. Indeed, this case is more like *Clark* than

19

*Zschernig* because the Association brought a facial challenge, not an as-applied one.

Burying its head in the sand over *Clark*, the Association insists that "*Zschernig* is not limited to judicial scrutiny of foreign governments." *Id.* at 36. It instead advocates for a rule that *whenever* a state law "implicate[s] foreign affairs, foreign relations, and national security interests" it should be preempted. *Id.* at 39. But that's the exact categorical prohibition that the Court rejected in *Clark* (and reaffirmed in *Zschernig*): state laws are *not* preempted merely because they have "some incidental or indirect effect in foreign countries." *Zschernig*, 389 U.S. at 433 (quoting *Clark*, 331 U.S. at 517).

The Association also asks the Court to ignore *Shames*, a decision that upheld an alien-ownership law on the ground that *Zschernig* is limited to laws that, in application, result in judicial criticism of foreign governments. Summary affirmances, it says, do not bind this Court because *Shames* is not "within the same litigation" as this appeal, Appellee Br. 42, and it urges that, even if *Shames* has some "precedential value," that value is "considerably less … than an opinion on the merits," *id.* (quoting *Compt'r of Treas. Md. v. Wynne*, 575 U.S. 542, 559–60 (2015)).

20

Appellate Case: 25-2050     Page: 27     Date Filed: 02/18/2026 Entry ID: 5609133

To start, the Association is incorrect about the binding scope of summary affirmances. In *Hicks v. Miranda*, 422 U.S. 332 (1975), the Court held a lower court "was not free to disregard" a summary affirmance in *Miller v. California*, 418 U.S. 915 (1974). *Hicks*, 422 U.S. at 344. *Hicks* and *Miller* were not decisions "within the same litigation." As for summary affirmances' supposedly lesser precedential value, the Supreme Court has said they have less value—when considering whether those decisions bind *the Supreme Court*. *See Wynne*, 575 U.S. at 559–60. When addressing lower courts, the Supreme Court has said that they "are bound by summary decisions … until … the Court informs them that they are not." *Hicks*, 422 U.S. at 344–45 (citation modified).

### B. The Association's field-preemption argument fails even if this Court adopts the Ninth Circuit's test.

Finally, the Association invites the Court to follow the Ninth Circuit and adopt a field-preemption test that far exceeds *Zschernig*. Appellee Br. 39–41. This at least admits that *Zschernig* has little to say about field preemption beyond "the Court's reaction to [the] particular regulatory statute" there. *Garamendi*, 539 U.S. at 440 (Ginsburg, J., dissenting) (quoting 10 Op. O.L.C. 49, 50 (1986)); *see* Appellee Br. 39 (suggesting

21

that the Supreme Court has not adopted "a clear standard for foreign affairs field preemption"). But the Ninth Circuit's test fails too.

In the first place, following dicta from footnote 11 of *Garamendi*, which ultimately declined to reach any conclusion on the matter, 539 U.S. at 419 n.11 & 420 (providing "no answer" to which of the "contrasting theories" in *Zschernig* was correct), the Ninth Circuit's rule would deny field preemption in the one circumstance where *Zschernig* found it. Under its rule, conflict preemption would be required if a State "acted within … its 'traditional competence.'" *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1073 (9th Cir. 2012) (en banc) (quoting *Garamendi*, 539 U.S. at 419 n.11). But in *Zschernig*, the State was regulating alien land inheritance, an intensely traditional state regulation, and the Court found preemption absent any conflict. On the other hand, the Ninth Circuit's rule would jettison *Zschernig*'s constraints and not require judicial criticism of foreign governments, instead simply asking whether the "state law" itself "intrudes on the federal government's foreign affairs power." *Id.* at 1074. This is the kind of reasoning that *Clark* found "extraordinary" and "far fetched." 331 U.S. at 517.

22

Yet even under the Association's preferred test, its field-preemption claim fails at step one: Arkansas's laws have a "serious claim to be addressing a traditional state responsibility." *Movsesian*, 670 F.3d at 1074. The challenged portions of Act 174 and Rule K address foreign property ownership within Arkansas's borders, a matter that has always been the States' responsibility and that *Clark* said was "far fetched" to deem facially preempted by the foreign-affairs power.

The Association's only response is an argument that regulating foreign property ownership is not a traditional state responsibility for Arkansas because Arkansas has not historically exercised it. Appellee Br. 43–45. That response has two flaws.

First, whether a State has historically exercised a traditional state responsibility is not the Ninth Circuit's test. For example, the district court relied on the Ninth Circuit's opinion in *Gingery v. City of Glendale* where the Ninth Circuit asked whether establishing a human-rights monument was " well within the traditional responsibilities of state and local governments," 831 F.3d 1222, 1229 (9th Cir. 2016), not whether the defendant city had ever assumed that responsibility before. To the contrary, in holding the monument was a traditional responsibility, it

23

reasoned that the city "ha[d] *joined* a long list of *other* American cities that have likewise used public monuments to express their views" on foreign affairs. *Id.* at 1230 (emphases added). A contrary rule that looked to a particular State's or city's regulatory history—instead of the Nation's history[5]—would make the Ninth Circuit's test even less defensible; one State's law would be field-preempted because it was the first of its kind in that State, while an identical law in another State would be upheld. Preemption does not work that way.

Second, even if the test focused on state-specific tradition, the Association's focus on *Applegate v. Lum Jung Luke*, 291 S.W. 978 (Ark. 1927), is unpersuasive. *See* Appellee Br. 43–45. That decision was based on an Arkansas constitutional provision that prohibited certain distinctions specifically "between resident aliens and citizens." *Applegate*, 291 S.W. at 979 (quoting Ark. Const. art. 2, § 20). It thus provides no

---

[5] The Association does not seriously dispute that States have traditionally regulated alien property ownership. Its only response to cases like *Blythe* is that they "recognize[] the supremacy of a treaty over 'the law of a particular state' when in conflict." Appellee Br. 45 (quoting *Blythe*, 180 U.S. at 340). But the rest of that quote from *Blythe* explains that "from the earliest times" legislative authority over alien property ownership has belonged to the States "in the absence of any treaty." 180 U.S. at 340–41.

Appellate Case: 25-2050    Page: 31    Date Filed: 02/18/2026 Entry ID: 5609133

information about Arkansas-specific traditions of distinguishing between all other aliens and Arkansans.

### III.   THE PRELIMINARY INJUNCTION IS OVERBROAD

As Defendants explained in their opening brief, the district court's injunction was overbroad in two respects: First, it enjoined provisions of Act 174 and Rule K that deal exclusively with permitting digital asset mining businesses that the Association did not challenge and the district court did not hold unconstitutional.  Appellants' Br. 49–52.  Second, it enjoined Defendants from enforcing Act 174 and Rule K against anyone and everyone, not just the Association and its members.  *Id.* at 52–53. Both these errors make the district court's preliminary injunction "more burdensome to [Defendants] than necessary to provide complete relief to" the Association.  *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025) (emphasis omitted) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). The Association is also concerned about Defendants not ordering a transcript of the preliminary-injunction hearing.  Appellee Br. 10–12, 48.

*Non-preempted provisions enjoined.*  Like the district court, the Association ignores that Arkansas law specifically provides—twice—that every legal provision is severable unless "specifically provided."  Ark.

Appellate Case: 25-2050     Page: 32     Date Filed: 02/18/2026 Entry ID: 5609133

Code Ann. §§ 1-2-117, -205. Instead, the Association points to an unsupported laundry list of reasons the district court believed the prohibited-foreign-party provisions (which are codified in one title of the Arkansas Code) have the same purpose as the permitting provisions that protect local utilities and landowners (which are codified in another title). Appellee Br. 47–48. Although the Association could have tried to supplement the district court's unreasoned list, it didn't, choosing instead to assert that Defendants forfeited any argument that the district court got it wrong and quoting chunks of Arkansas law with little explanation. Appellee Br. 48–50. As explained below, Defendants did not forfeit their argument. *See infra* p. 17. In any event, it would be hard to substantively defend the district court's assertions because they boil down to

- There is "much" about prohibited foreign parties in Act 174 (although it is less than half of the Act).
- Arkansas had not previously regulated digital asset mining businesses like it did in the Act (though that's true for every new regulation).
- There is one cross reference in the permitting provisions to the prohibited-foreign-party provisions.

26

- Rule K has more than one provision about prohibited foreign parties.

- Act 174 does not contain a severability clause (although the Arkansas Code contains two universal ones).

Add. 55–56; App. 215–16; R. Doc. 32, at 55–56.

These would be true of most laws that regulate a new industry, and (if the correct analysis) would never allow a court to enjoin only a portion of such a law. In the end, it appears the district court was simply hesitant to do the "require[d]" work of determining whether it could limit the injunction to a few provisions in a detailed analysis. Add. 57; App. 217; R. Doc. 32, at 57. For the reasons explained in Defendants' opening brief, that work was required; the injunction should not extend to the permitting provisions of Act 174 and Rule K. *See Sisney v. Kaemingk*, 15 F.4th 1181, 1194 (8th Cir. 2021) ("Generally, when confronting a constitutional problem in a law, courts should limit the solution by enjoining enforcement of any problematic portions while leaving the remainder intact." (citation modified)).

*Preliminary injunction extends to nonparties.* As the Supreme Court recently reaffirmed, an "injunction's protection extends only to the

27

suing plaintiff," so it may *not* "offer[] complete relief to *everyone* potentially affected by an allegedly unlawful act." *CASA*, 606 U.S. at 852. "[B]enefit[s]" to nonparties may only result from the "incidental" "practical effect[s]" of awarding the named plaintiff complete relief. *Id.* The Association seems to agree that a universal injunction is unnecessary for complete relief, arguing only that complete relief requires extending the preliminary injunction *to the Association and "the Association's members." See* Appellee Br. 51 (emphasis added). It thus appears the Association agrees with Defendants that, at the very least, the Court should limit the district court's preliminary injunction to Defendants' enforcement against the Association and its members.

*The hearing transcript.* The Association also argues that the Court need not address the scope of the injunction (or perhaps dismiss the appeal altogether) because Defendants did not order a transcript of the preliminary-injunction hearing. Appellee Br. 10–12, 48. It bases this argument on Federal Rule of Appellate Procedure 10(b). But under Rule 10, an appellant must include a transcript *only* if it argues "that a finding or conclusion is unsupported by the evidence or contrary to the evidence." Fed. R. App. P. 10(b)(2). So while it is certainly true that "[t]he district

28

court made findings of fact," Appellee Br. 11, that's not the standard for whether Defendants needed to include the transcript on appeal. Defendants have not argued that those findings affected the erroneous scope of the district court's injunction; the district court's errors were legal ones, not factual ones. *See CASA*, 606 U.S. at 852, 856 (explaining that, "[a]s a matter of law … only … the suing plaintiffs" may obtain an injunction and noting the scope of the courts' equitable power is a "question[] of law"); *Styczinski v. Arnold*, 141 F.4th 950, 954 (8th Cir. 2025) (calling "severability" a "question[] of law"). So while best practices may have been to file a certificate that Defendants did not intend to order the transcript, Fed. R. App. P. 10(b)(1)(B), the transcript has nothing to do with the issues on appeal and is thus not required. Thus, the Court is not prevented from addressing the purely legal scope-of-the-injunction issues before it. And there is certainly no reason to dismiss the entire appeal; indeed, even the Association discusses the transcript only as to injunction's scope.[6]

---

[6] The Association's citation to *Droste v. Julien*, 477 F.3d 1030 (8th Cir. 2007), is not to the contrary. Appellee Br. 11. In *Droste*, the order the appellants appealed from specifically incorporated "rulings made during the in-court hearing." 477 F.3d at 1034 (emphasis omitted). Because

Appellate Case: 25-2050    Page: 36    Date Filed: 02/18/2026 Entry ID: 5609133

## IV. THE ALTERNATIVE GROUNDS FOR AFFIRMANCE ARE UNAVAILING.

If this Court holds the Association is unlikely to succeed on its preemption claims, the Association suggests the Court affirm because it is likely to succeed on its other constitutional claims, Appellee Br. 54–59, which the district court declined to reach, Add. 51; App. 211; R. Doc. 32, at 51. Although this Court may affirm on alternative grounds, it typically does not decide novel questions the district court did not address, *see Wivell v. Wells Fargo Bank, N.A.*, 773 F.3d 887, 899–900 (8th Cir. 2014), especially where "it would be beneficial for the district court to consider an alternative argument in the first instance," *Tovar*, 857 F.3d at 779. That's the case here. Besides the lack of district court review, the Association only devotes one-half to two pages to each alternative, and the limitations on reply briefing necessitate a similarly truncated response. This Court should only address the claims on which the district court

---

those rulings were only made on the transcript, the Court could not know how the district court ruled; indeed, the parties even disputed whether "the district court dismissed the claims." *Id.* at 1035. No such ruling-by-incorporation occurred here.

30

Appellate Case: 25-2050   Page: 37   Date Filed: 02/18/2026 Entry ID: 5609133

based its injunction, and on which the parties have focused their attention.

If this Court does reach the Association's other claims, it should reject them. The Association first claims that Act 174 and Rule K violate equal protection. But it fails to acknowledge (much less address) the Supreme Court's repeated holdings that state laws restricting alien property ownership do not violate equal protection. *See, e.g.*, *Porterfield v. Webb*, 263 U.S. 225, 232–33 (1923); *Terrace v. Thompson*, 263 U.S. 197, 219–22 (1923).

The Association next claims Act 174 and Rule K violate due process, apparently because of the "presumption[] against retroactive legislation." Appellee Br. 57. But that alone is not an argument that the statute is unconstitutional. *Cf. United States v. Darusmont*, 449 U.S. 292, 298–99 (1981) (noting that a law's "retroactiv[ity]" is not a "*per se*" due process violation).

Then, the Association asserts that Act 174 and Rule K violate the Commerce Clause because "the text and legislative history" (neither of which the Association analyzes) show "discriminating against interstate and foreign commerce was the purpose" of the laws. Appellee Br. 58. But

31

that's not the line Act 174 and Rule K draw. Rather, they distinguish between the few foreign states on the ITAR list and all other foreign states that are not on that list. And laws that discriminate between subsets of out-of-state commerce are nondiscriminatory. *See Exxon Corp. v. Gov. of Md.*, 437 U.S. 117, 125–27 (1978) (upholding law that distinguished between gas stations owned by oil refiners, all of which were out of state, and gas stations that were not, some of which were out of state).

Finally, the Association asserts that Act 174 and Rule K "threaten" takings and therefore "violate the Takings Clause," without explaining how they do so. *Id.* Setting aside that "[a]n undeveloped argument is waived," *United States v. Moua*, 145 F.4th 929, 935 (8th Cir. 2025), a law doesn't constitute a taking merely because it "threatens" one. Further, Act 174 and Rule K would at most require the Association's members to sell their interests in a digital asset mining business to one of the many potential buyers unaffected by those laws. And requiring a sale is not an uncompensated taking. *See, e.g.*, *TikTok, Inc. v. Garland*, 122 F.4th 930, 969 (D.C. Cir. 2024); *United States v. Rodgers*, 461 U.S. 677, 697 (1983).

Appellate Case: 25-2050     Page: 39     Date Filed: 02/18/2026 Entry ID: 5609133

## Conclusion

For these reasons, the Court should reverse or vacate the district court's order granting a preliminary injunction.

Respectfully submitted,

TIM GRIFFIN
  Arkansas Attorney General

AUTUMN HAMIT PATTERSON
  Solicitor General

NOAH P. WATSON
  Deputy Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
101 West Capitol Avenue
Little Rock, Arkansas 72201
(501) 682-1019
noah.watson@arkansasag.gov

*Attorneys for Appellants*

33

## Certificate of Compliance

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 6,450 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)–(6) because it has been prepared in 14-point Century Schoolbook, using Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/ *Noah P. Watson*
Noah P. Watson

Appellate Case: 25-2050    Page: 41    Date Filed: 02/18/2026 Entry ID: 5609133

## Certificate of Service

I certify that on February 17, 2026, I electronically filed the fore-going with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ *Noah P. Watson*
Noah P. Watson

Appellate Case: 25-2050    Page: 42    Date Filed: 02/18/2026 Entry ID: 5609133